# United States Court of Appeals
## For the First Circuit

No. 07-1341

NÉSTOR M. TORRECH-HERNÁNDEZ,

Plaintiff, Appellant,

v.

GENERAL ELECTRIC COMPANY,
CARIBE GE INTERNATIONAL ELECTRIC METERS CORP.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Baldock,[*] Circuit Judges,
and Smith,[**] District Judge.

Manuel Durán, with whom Manuel Durán Law Office was on brief for appellant.
Carl Schuster, with whom Lourdes C. Hernández-Venegas, and Schuster Aquiló LLP, on brief, for appellees.

March 7, 2008

---

[*] Of the Tenth Circuit, sitting by designation.

[**] Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**.  In this age discrimination case, Plaintiff-appellant Néstor M. Torrech-Hernández ("Torrech"), a former plant manager for Defendant-appellees General Electric Company and Caribe GE International Electric Meters Corporation (collectively "GE"), challenges the entry of summary judgment in favor of his former employer, GE.  Having conducted a careful de novo review, and discerning no reversible error, we affirm albeit on grounds different than the District Court.

## I.   BACKGROUND

Over the course of his twenty-eight year career at GE, Torrech held various positions within company, including plant manager at several GE facilities in Puerto Rico.  In July 2000, then-President and General Manager of Caribe GE Paul Sledzick appointed the forty-nine year-old Torrech, who was at that time plant manager at GE's Vega Baja plant, to run the GE facility in Humacao.  Torrech's appointment to Humacao, while not a promotion, involved running a larger plant with more employees and included a more complicated and varied production scheme.  Because of Humacao's size and its role in GE's Puerto Rican market, the job of Humacao plant manager was akin to managing three different plants within one facility.  Just as with each of his previous plant manager positions, at Humacao Torrech ultimately was responsible for his plant's operations and overall results.

In April of the following year, after a short transition period, Jeff Sommer replaced Sledzick as President and General Manager of Caribe GE. During his transition period, Sommer familiarized himself with the plants under his authority, the challenges facing those plants, and plans for improvement. Based on his observations, Sommer believed that the operations in GE's Puerto Rico plants needed to improve in five areas ("matrices" in GE jargon): service, cost out, quality, inventory and environmental health and safety. As to the Humacao location in particular, Sommer concluded that the plant was struggling in all five matrices and lagging behind the other sites. Sommer communicated his concerns and plans for improvement to Torrech, specifically his expectations as to service and productivity improvement. Torrech considered Sommer's plans for improvement to be good business ideas.

Nevertheless, over the course of Sommer's first few months as President and General Manager, it became clear that despite Torrech's professed agreement with Sommer's ideas, he was neither implementing the improvement plans nor meeting Sommer's expectations. Despite his claim that the Humacao plant was meeting, if not exceeding, company expectations during his time as plant manager, Torrech admitted that his work was not what he wanted it to be. In his deposition, Torrech described his performance as having its "ups and downs," and agreed that during

his time as plant manager, Humacao experienced numerous shut downs. At the same time, however, Torrech insisted that under his lead, Humacao was generally on an upward trend. However, to others, it was apparent that Torrech was resistant to change and new ideas.

Torrech complains of several incidents occurring in the months following Sommer's arrival in Puerto Rico as being directly related to what he perceived to be GE's hostility towards older workers. On the evening of Sledzick's retirement party, held at a local hotel, Roger Gasaway, to whom Sledzick reported in GE's corporate division, remarked to Torrech that there was a perception at GE that Torrech lacked the energy level he once had. Several weeks later, on April 18, 2001, while touring the Humacao plant, Sommer made a similar remark, commenting on Torrech's lack of energy. Torrech did not ask Gasaway or Sommer what they meant by their comments. Rather, Torrech assumed the comments referred to lack of intensity or enthusiasm. He connects these characteristics to age by noting that "normally when you grow old you grow slower." At the same time, Torrech acknowledges his familiarity with the "Four E's," consisting of "Edge," "Energy," "Excellence," and "Energized," a common mantra in GE company jargon.

Torrech similarly attributes age-based animus to a comment made by Sommer during a meeting at the Hard Rock Café in Old San Juan. According to Torrech, who cannot recall the context of the statements, Sommer generally referred to the staff as

"dinosaurs." Torrech inferred from the comment that Sommer felt he and other employees were "old, sluggish, obsolete, you know, outdated." Another staff member in attendance, Nora Henríquez, a human resources manager, recalls that Sommer made the "dinosaur" comment in response to an inquiry about how the corporate headquarters viewed the Puerto Rico operations. According to Henríquez, Sommer used the term when explaining the perception that the organization was less automated than others, that it was not implementing change in the same manner as other operations, and that it appeared resistant to new initiatives.

The final incident complained of by Torrech took place on June 18, 2001. During a tour of the Humacao facility, in a particularly warm section of the plant, Sommer pointed to an employee, described by Torrech as an "old person," and stated: "You see that person? In Vega Baja no longer –- nobody no longer walks that slow." Torrech retorted "In Vega Baja nobody sweats like that." Later, in Torrech's office, Sommer indicated that he was not happy with how the plant was being run, and that if he did not see improvement, he would implement changes himself. Although Sommer never explicitly referenced Torrech's performance as plant manager or mentioned the age of any GE employee, Torrech interpreted Sommer as speaking specifically about him, and, further, that Sommer was implying that he wanted to replace Torrech with a younger employee.

In the evening after the conversation, Torrech called Henríquez and asked whether there were any plans to replace him. Although Henríquez denied that there were any such plans, Torrech volunteered to her that he would be willing to leave GE "peacefully" if offered a severance package. Henríquez contacted Sommer to inform him about Torrech's call. Without ordering or authorizing Torrech's termination, Sommer responded that they should analyze the situation and identify what Torrech wanted. After Torrech's phone call, and after getting the go-ahead from Sommer, Henríquez began to put together initial figures for a severance package. In the meantime, Sommer updated Gasaway about Torrech's phone call, indicated that they would begin to formulate an "exit plan" for Torrech, and identified Victor Aguilar, a thirty-three year-old long-term GE Caribe employee, as a possible replacement. At no time during the course of these or the preceding events did Torrech, who was well familiar with GE's anti-discrimination policy, complain of discrimination or utilize the internal procedures available to him.

Over the course of the next month, Henríquez began corresponding back and forth with Torrech about his severance package. On July 13, 2001, Henríquez sent to Torrech, via e-mail, a sample waiver form and proposed severance package. She explained to Torrech that she would soon follow up on other matters, including resignation announcements, and asked that Torrech get

back to her with his thoughts. The following Monday, Torrech responded somewhat cryptically - announcing his disappointment in the dollar value of the package, but neither rejecting the package nor commenting on its terms or on Henríquez's statement about his resignation. Several days later, Henríquez and Torrech reviewed together three possible severance packages. After e-mailing Torrech to inquire as to his thoughts on the proposals, Henríquez received the following response: "I need the money. It has to be $150k and on payroll until September 30, 2001. We can make the announcement tomorrow." Two days later, at 7:30 a.m. Henríquez sent to Torrech a draft organizational announcement, and sought his comments on it. Immediately after, and before the plant-wide e-mail was finalized or distributed, Torrech sent an e-mail to his staff and Henríquez announcing his retirement. An official announcement was released by human resources later that same day.

The following day, and after further discussions, Henríquez, apparently under the impression that Torrech had agreed to the terms offered by GE, sent him a confirmation e-mail with a final severance agreement. In that e-mail, Henríquez gave Torrech information about his tax obligations, stocks, and pension plan, and asked that he return certain company property. The next day, however, on July 25, 2001, Torrech responded curtly - "I am not going to sign anything. Tell Jeff I will see him in court." Despite this declaration, Torrech requested an extension of time

within which to consider GE's offer. By August 3, 2001, hearing no further response from Torrech, Henríquez wrote to Torrech and reiterated the company's final severance offer, gave him an additional week to consider the terms, and informed Torrech that she would not continue negotiating with him past August 8, 2001. Immediately, Torrech requested another extension to consider the severance, and Henríquez granted him additional time until August 15, 2001. On August 10, 2001, after consulting an attorney, Torrech rejected the severance offered by GE, requested instead a lump sum payment of $400,000, and informed Henríquez that if the new sum was not accepted, he wished to return to his position as plant manager. Torrech also threatened legal action if his terms were not accepted. GE rejected Torrech's demands, and removed him from the company payroll effective August 15, 2001.

Torrech filed the present action in which he alleges that he was terminated or subject to constructive discharge based on his age. Torrech brought his suit against GE in the District of Puerto Rico under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634; Puerto Rico's version of the ADEA, known as Law 100, 29 P.R. Laws Ann. § 146 et. seq.; and Puerto Rico's Law 80, 29 P.R. Laws Ann. § 185(a), which prohibits unjust dismissal.

The District Court granted summary judgment as to Torrech's ADEA claim and dismissed without prejudice the remaining

supplemental state law claims. In doing so, the Court held that Torrech failed to establish a prima facie case of age-based discrimination. The Court went on to hold that, even assuming Torrech could meet his initial burden, and viewing the facts in the light most favorable to him, on the evidence presented, Torrech failed to establish that GE's proffered business reason for his termination was a pretext for discrimination. Torrech timely appealed, asserting that the District Court erred in its ultimate holdings and, in doing so, improperly drew inferences in favor of GE.

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. See Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As was the obligation of the District Court below, we must take the facts of record in the light most flattering to the nonmovant (here, Torrech) and draw all reasonable inferences in his favor. See Iverson, 452 F.3d at 98; Dávila v. Corporación de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist." Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir.

-9-

2007) (citation omitted). Summary judgment cannot be defeated, however, "by relying on improbable inferences, conclusory allegations or rank speculation." Id.

### III.  DISCUSSION

Torrech alleges that he was fired from his position as plant manager at GE's Humacao plant because of his age. He alternatively alleges that if he wasn't fired, he was constructively discharged and replaced by a younger employee as a part of GE's efforts to rid the Humacao operation of older workers. In order to succeed on these claims, Torrech must adduce facts sufficient to support an inference of discrimination, and in doing so may not rely on bold assertions, unsupported conclusions, or optimistic surmises. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007). Because the non-movant has the burden of proof, "the evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment." Id. As correctly found by the District Court, Torrech's efforts fail to clear this hurdle.

Before setting forth the appropriate test and accompanying analysis for establishing a violation of the ADEA, we must address one of Torrech's underlying premises for this appeal. Torrech contends that the District Court, in failing to credit at face value each of his assertions, impermissibly failed to draw all inferences in his favor. While it is true that in the summary

-10-

judgment context all _reasonable_ inferences must be drawn in favor of the non-moving party, the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party.[1]  See _Colantuoni_ v. _Alfred Calcagni & Sons, Inc._, 44 F.3d 1, 6 (1st Cir. 1994) (a party resisting summary judgment may not rest on mere allegations or denials, but must identify and allege specific facts showing a genuine issue for

---

[1] Torrech's Counterstatement of Material Facts in Controversy and Statement of Objections contains numerous statements by Torrech that, while representing Torrech's own subjective interpretation of seemingly innocuous words and actions on the part of Sommer, are presented as material facts.  Such representations include Torrech's statements, citing only to his own deposition, that "Among the ideas that Sommer allegedly brought as GM was the idea of getting rid of old people in the [Puerto Rico] organization." Likewise, as support for his discrimination claim, and as part of his denial of GE's assertion that Sommer wanted to improve Humacao plant operations, Torrech includes the following as a _material_ _fact_ - "Sommer's message [when he handed to Torrech his recent, positive, performance review] was clear:  'you are an old man and I do not care about how you have performed or about how Paul Sledzick thinks you are performing.  I am going to get you out anyway because of your age.'"  It is important to reiterate that these are quotations of Torrech's own thoughts - not words alleged to have been spoken by Sommer.  Torrech makes numerous similar assertions and argues that inferences must be drawn in his favor based on these musings.  We are not obliged to take at face value Torrech's subjective beliefs when they are not factually based and merely constitute conclusory, self-serving statements. See _Vega_ v. _Kodak Caribbean, Ltd._, 3 F.3d 476, 479 (1st Cir. 1993) (material creating a factual dispute "must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth").  Thus, the District Court's disregard for certain statements and allegations put forward by Torrech does not constitute an impermissible failure to draw all inferences in his favor, nor does it amount to impermissible inference-drawing in favor of the moving party.

-11-

trial); Velázquez-Fernández,476 F.3d at 10.  This is particularly true where, as here, Torrech submitted as part of his objection to GE's motion for summary judgment an affidavit in which he seemingly contradicts his own deposition testimony and asserts what amount to nothing more than self-serving, factually-devoid declarations. See Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001) ("a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony"); Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006).  Therefore, insomuch as the District Court did not consider certain statements and assertions put forward by Torrech in support of his objection to GE's motion for summary judgment as constituting reliable evidence or a disputed material fact, there was no error.

Pursuant to the ADEA, an employer is prohibited from taking an adverse employment action against an employee who is forty years of age or older because of that employee's age. See 29 U.S.C. §§ 623(a)(1),631(a); Bennett, 507 F.3d at 30.  "When an employee claims to have been discharged in violation of the ADEA, he must shoulder the ultimate 'burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age.'"  Davila, 498 F.3d at 15 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991)).  When direct evidence of age discrimination is lacking, an

employee may utilize the McDonnell Douglas burden-shifting framework to carry his burden. Dávila, 498 F.3d at 15 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)).

The initial step in the burden-shifting framework requires the employee to establish a prima facie case of age discrimination. Velázquez-Fernández, 476 F.3d at 11. To do so, the plaintiff-employee must set forth facts showing each of the following: (i) that he was at least forty years old at the time of the adverse employment action complained of; (ii) that his job performance met or exceeded the employer's legitimate expectations; (iii) that his employer actually or constructively discharged him; and (iv) that his employer had a continuing need for the services he had been performing. See id.; Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 119 (1st Cir. 2005). Upon a sufficient prima facie showing, the burden of production shifts to the defendant-employer "to articulate a legitimate, nondiscriminatory basis for its adverse employment action." Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006) (citation omitted).

The employer's burden is minimal - it "need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." Dávila, 498 F.3d at 16. Once the employer has satisfied this requirement, the burden shifts back to the employee, who must then show, by a preponderance of the evidence, that the "reason

-13-

given by the employer for the discharge is pretextual, and, moreover, that it is pretext for age discrimination." Id. (citation omitted); Velázquez-Fernández, 476 F.3d at 11. "In other words, the bottom-line question of discrimination vel non comes front and center." Dávila, 498 F.3d at 16. At this stage in the proceedings, "this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age." Id. (citing Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 78 (1st Cir. 2005)).

Here, it is undisputed that Torrech, who was 50 in the summer of 2001, satisfies the age requirement of the prima facie test. As to whether Torrech's performance met or exceeded GE's legitimate expectations, the parties disagree. Torrech highlights his positive review and accompanying salary increase from January of the same year as evidence that he was meeting the legitimate expectations of his superiors. GE, on the other hand, primarily cites Torrech's own testimony as to the "ups and downs" experienced in the Humacao plant during his tenure there, and his admission that Humacao was "not where I would like [it] to be" on the five matrices. The District Court considered Torrech's testimony, along with evidence establishing certain deficiencies in the Humacao plant's productivity under Torrech, to find that Torrech was not

meeting his employers' expectations as plant manager at the Humacao facility.

Although we agree with the District Court's ultimate decision to grant summary judgment to GE, we do not agree with its analysis or conclusion as to the second prong of the prima facie test. Despite GE's assertions that the Humacao plant was not reaching projected financial goals and that Torrech, as plant manager, was not doing enough to implement necessary change, GE has been steadfast in its position that but for Torrech's voluntary resignation, he would not have been fired. Sommer testified, and counsel reaffirmed at oral argument, that if Torrech had not voluntarily left his position, and improvement was not made in the Humacao plant, Torrech would have been placed on a structured improvement plan, not terminated. Thus, GE's tactical claim that Torrech was not meeting legitimate job expectations is directly at odds with its assertion that Torrech resigned on his own initiative, and that he was doing well enough in his role as plant manager that there were no plans to fire him.

Although it is Torrech's burden to establish a prima facie case of discrimination, as the employer, GE cannot play fast and loose with the facts in order to position itself advantageously with regard to the burden shifting scheme of the McDonnell Douglas rubric. By simultaneously proclaiming that Torrech was doing sufficiently well as plant manager that there were no plans to get

rid of him, and that he was failing to meet work expectations in order to legitimize his dismissal, GE improperly attempts to play both sides against the middle. This juxtaposition of claims belies the appropriateness of granting of summary judgment on this ground.

Unlike situations in which an employer can document well an employee's failure to meet legitimate expectations, in this case no such documentation exists. On the contrary, as Torrech points out, the performance review conducted within six months of his decision to part ways with GE Caribe was positive, and resulted in a salary increase. Furthermore, while it is true that Torrech admitted that he could have performed better, this falls far short of proving that he has failed to meet his employer's legitimate performance expectations. An "employee's perception of himself . . . is not relevant. [Rather,] [i]t is the perception of the decision maker which is relevant." Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 338 (7th Cir. 1991) (citation omitted). There is just no factual support, save Sommer's after-the-fact testimony as to Torrech's alleged failings, for GE's assertion that Torrech was not meeting its legitimate expectations. This, coupled with GE's assertion that Torrech was performing sufficiently well enough that termination was not planned for him, undermines the District Court's conclusion on this issue. Because only a minimal evidentiary showing is necessary to satisfy an employee's burden of production at this stage, it cannot be said

that Torrech did not set forth at least minimally sufficient evidence to overcome summary judgment on this prong of the test. Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005); Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000) (burden of establishing a prima facie case is not an onerous one).

Although we disagree with the District Court's analysis of the second prong of the McDonnell Douglas rubric, Torrech's claim nevertheless falls far short of the mark on the third prong. Torrech fails to present facts from which a reasonable jury could conclude that he was discharged; and further, he has come forward with insufficient evidence of pretext. While the District Court abstained from making a determination on the third prong of the McDonnell Douglas test, we think the inquiry is determinative of Torrech's appeal. Adverse employment action, for purposes of the ADEA, includes actual or constructive discharge. On the undisputed facts of this case, viewed in the light most favorable to Torrech, we think that it is clear that Torrech resigned his position. Torrech initiated the talks that lead to his resignation, and he concedes that he expressed a desire to leave the company in exchange for a severance package. Torrech presented no facts at all, aside from his personal belief, to support his assertion that he was terminated from his position as plant manager. Finally, and most tellingly, Torrech sent to his employees an unambiguously worded resignation announcement, without being prompted or

-17-

instructed to do so by GE.[2]  Although Torrech denies that his letter was in fact a resignation, this argument is hard to take seriously.  Torrech's words speak for themselves.

Moreover, even Torrech does not wholeheartedly deny that he resigned.  Rather, he contends that if he did resign, he was forced to do so under circumstances that amounted to constructive discharge.  It is well-established that "[j]ust as the ADEA bars an employer from dismissing an employee because of his age, so too it bars an employer from engaging in a calculated, age-inspired effort to force an employee to quit."  De La Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004) (citation omitted).  "To prove constructive discharge, a plaintiff must usually 'show that her working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign.'"  Id. (quoting Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003)); see also Velázquez-Fernández, 476 F.3d at 12.  "It is not enough that the plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  De La Vega, 377 F.3d at 117 (citation omitted).

---

[2] Torrech's unprompted e-mail of July 24, 2001, sent before a company-wide announcement was made, stated:  "After 27 wonderful years with GE, I have decided to a change of pace and to pursue my own business opportunity more in tone with my present plan for life and health condition.  You have been a great team and we did great things together.  Thank you for letting me be your leader this past year.  God bless you all.  Néstor."

In order to establish constructive discharge, Torrech must show that conditions were so intolerable that they rendered a seemingly voluntary resignation a termination. In such cases, "[t]he question is not whether working conditions at the facility were difficult or unpleasant," but rather, an employee "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). Thus, in order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will. Id.; see also Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993) (constructive discharge exists where employer's actions "effectively vitiate the employees' power to choose work over retirement"); Equal Employment Opportunity Comm'n v. Univ. of Chicago Hosps., 276 F.3d 326, 332 (7th Cir. 2002) ("When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.").

The gravamen of Torrech's constructive discharge claim is that the words and actions of his employer, beginning with Sommer's arrival in Puerto Rico, lead him to believe that he would soon be terminated from his position as plant manager of the Humacao facility. In support, Torrech cites to the four incidents

-19-

described above - namely, the two times that Torrech was told that he lacked the same "energy" he once had, the meeting at which Sommer used the term "dinosaur" when describing the local operations, and the incident at the Humacao plant during which Sommer commented on an older employee and then later indicated that he wanted to make changes. Torrech contends that these comments led him to believe that older employees were no longer welcome at GE and that he eventually would have been fired had he not taken matters into his own hands. Regardless of how Torrech subjectively felt about these comments (assuming they were made and intended to be age-related), these incidents alone do not amount to constructive discharge.[3] See Alfieri v. SYSCO Food Servs.-Syracuse, 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001) (an "employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive

_____

[3] In support for his argument that he resigned because he otherwise would have been fired, Torrech cites to an e-mail written by Sommer and sent to Roger Gasaway, Henríquez, and another human resources representative, in which Sommer describes putting together an "exit plan" for Torrech. Torrech cites the e-mail as proof that GE planned to get rid of him. His assertion, however, is undercut by the rest of the e-mail and the context in which it was written. The subject e-mail was written two days after Torrech's June 18, 2001 phone call to Henríquez in which he initiated resignation negotiations. The e-mail does not reveal any nefarious intent on the part of Sommer. Rather, it informs Gasaway, Sommer's superior, of Torrech's decision, and updates him on the "exit plan" for Torrech, as well as the necessary plans to fill the open position resulting from Torrech's departure.

discharge."); Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) (no constructive discharge where employer advises employee that employment status is contingent on future levels of performance and improvement).

There is nothing in the incidents cited that could allow a rational trier of fact to infer that GE deliberately created conditions so difficult or unpleasant that Torrech would have felt compelled to resign. See id. Nor is there any basis to conclude that a reasonable employee standing in Torrech's shoes would have believed that his termination was imminent. See Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998) (constructive discharge protects the employee who "decides to quit rather than wait around to be fired"); cf., EEOC, 276 F.3d at 332 (burden of establishing constructive discharge was met where evidence overwhelmingly pointed to employee's imminent termination, including employee's arrival at work to find her belongings packed and office being used for storage); Acrey v. Am. Sheep Indus. Ass'n, 981 F.2d 1569, 1574 (10th Cir. 1992) (upholding finding of constructive discharge where employee resigned because she was "too tired" to fight after her employer treated her as "incapable and uneducable" during her final months of employment, and after being asked to quit because of her age and "image," and told that if she did not quit she would be fired).

Torrech admits that prior to expressing his interest in resignation, he asked Henríquez whether there were any plans to have him replaced, and her answer was no.[4] Despite Henríquez's assurances, Torrech marched forward with his plan - he announced that he would resign in exchange for a severance package. There is no factual support in the record for Torrech's assertion that if he had not voluntarily done so, he would have been fired. There is only Torrech's claim that this was his subjective belief. This is too thin a reed to support a constructive discharge claim. An employee "may not be unreasonably sensitive to his [or her] working environment." Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (citation omitted). The standard for assessing a constructive discharge claim "is an objective one: it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 28 (1st Cir. 2002) (citation omitted); see also Calhoun, 798 F.2d at 561 ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge."); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).

---

[4] GE maintains that there were no plans to fire or otherwise replace Torrech. Instead, as discussed above, Sommer testified that if Torrech had remained, and the Humacao plant had continued to have difficulties in the five matrices, Torrech likely would have been put on an improvement plan. Such a placement does not constitute a constructive discharge. See Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002).

-22-

Here, Torrech insists that his personal opinion, and his perception that he was wanted out of the organization, should suffice as support for his constructive discharge claim. He relies on little else to establish that he was compelled to resign by threat of imminent termination. However, apprehension of future termination is insufficient to establish constructive discharge - instead, an employee "is obliged 'not to assume the worst, and not to jump to conclusions too fast.'" Agnew, 286 F.3d at 310 (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)). Here, even accepting as true all facts alleged by Torrech, nothing presented to us evidences any immediate intent on the part of GE to rid itself of older employees, including Torrech. The bottom line is that Torrech's resignation was grossly premature, as it was based entirely on his own worst-case-scenario assumption as to his future at GE.

In the alternative, Torrech also alludes to the negotiations leading up to his eventual removal from the company payroll as a constructive discharge. He posits that he was subject to a "take it or leave it" offer, whereby he was forced to choose between retirement and involuntary termination. Putting aside the inconsistency of these two theories for a moment, Torrech's conduct was nothing short of a deceptive bait and switch tactic, something which this Court cannot condone. We explain: Torrech first declared his desire to resign on June 18, 2001. One month later,

after GE gave him a close to, if not final, offer as to a severance package, Torrech tentatively indicated his agreement with it, unilaterally announced his resignation to his employees, and stopped working. Then, for several weeks following his resignation, Torrech continued to negotiate with the human resources representative as to the details of his severance package. On August 10, 2001, Torrech increased his severance demand by $250,000[5] to $400,000, well beyond the terms discussed, and nearly agreed-upon by the parties in the previous weeks. More tellingly, Torrech simultaneously warned GE that if his new demands were rejected he wanted his job back, and threatened legal action if his ultimatum were not accepted.[6] This is a classic bait and switch: Torrech initiated interest in a severance arrangement - he offered his resignation under what appeared to be a reasonable request for severance (which was met almost fully by GE), resigned and left work, and then rebuked GE's good faith offer by suddenly demanding a sum grossly out of proportion with the previous discussions. Then, to add insult to injury, Torrech threatened

---

[5] In an e-mail dated July 22, 2001, Torrech sought a lump sum payment of $150,000 as well as two months' salary. As of August 3, 2001, GE offered to Torrech a lump sum payment of $150,000 plus one month's salary. In his demand letter of August 10, 2001, Torrech increased his demand to $400,000 and threatened legal action should his dun be rejected.

[6] Upon Torrech's rejection of the severance package offered by GE, he was taken off of the company payroll effective August 15, 2001.

that if he did not receive his sought after plunder, he wanted his job back - the one from which he had already resigned and for which a replacement had been selected - or else.

GE's unwillingness to accede to Torrech's demands does not transform Torrech's resignation into a termination. Torrech selectively cites this Court's language in Vega, 3 F.3d at 480, in which we discussed the circumstances under which an offer of early retirement may be transformed into constructive discharge. There, we counseled "a plaintiff who has accepted an employer's offer to retire can be said to have been constructively discharged when the offer presented was, at rock bottom, 'a choice between early retirement with benefits or discharge without benefits." Id. (citation omitted). This case is clearly distinguishable from Vega in at least one crucial way - Torrech voluntarily resigned, without prompting or coercion by GE. See id.

As discussed above, Torrech presents no evidence suggestive of a plot by GE to rid itself of older employees or specifically to terminate Torrech. Rather, Torrech's resignation was unforced, driven by his willingness to part ways with his employer in exchange for a severance. GE's offer, and subsequent refusal, when faced with Torrech's bait and switch, either to pay Torrech's inflated demand or reinstate him, is not the "impermissible take-it-or-leave-it choice between retirement or discharge" that Vega describes. Under these circumstances, an

-25-

employer is not obligated to reinstate an employee who voluntarily resigned, nor is it obligated to continue severance negotiations with an employee whose demands were becoming increasingly unreasonable.

Although the District Court below hesitated to decide the question of whether Torrech was discharged or resigned because it found summary judgment was proper on other grounds, we are of the view, after taking the facts in the light most favorable to Torrech, that Torrech's separation from GE was without any serious doubt a voluntary resignation. Summary judgment was and is warranted on this ground.

If more were needed, and we believe it is not, Torrech's claim also fails for absence of pretext.[7] In his briefs before this Court, Torrech relies on his subjective opinions as to the motivations and intentions of Sommer and GE, few of which are fact-based. As detailed above, personal opinion, unsupported by fact, is not sufficiently probative on the issue of pretext. See generally Cruz-Ramos, 202 F.3d at 385 n.3. The only facts Torrech cites to show that GE's actions were but a pretext for age discrimination are the allegedly discriminatory comments made to Torrech. The first two incidents involved comments that Torrech seemed to lack energy. It is well-established that "energy," as

_____

[7] Torrech concedes that GE meets its burden of articulating a non-discriminatory reason for terminating him.

well as similarly defined terms, does not necessarily connote youth or other age-related characteristics.  See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 730 (8th Cir. 2001) (energy is a legitimate performance issue not facially related to age); Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1055 (7th Cir. 2006) (employer's "expressed interest in 'higher energy' employees, although potentially consistent with age discrimination, is not by itself direct evidence of such discrimination"); Fortier v. Ameritech Mobile Commc'ns Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) ("Standard usage and common sense dictate that 'energetic' means active . . . [and] simply cannot support a determination of age bias.").  Here, Torrech does not allege that the energy comments were made in the context of an age-related discussion, nor did he ask Sommer or Gasaway what they meant by their comments.  Thus, even assuming, for purposes of summary judgment, that the comments were not related to GE's "Four E" mantra, they are insufficient to establish discriminatory animus.

As for Sommer's dinosaur comment, even assuming, despite witness testimony to the contrary, that Sommer's statement communicated a personal belief, it does not on its face evidence age-related animus or bias.[8]  Standard usage of the term "dinosaur"

---

[8] District courts outside of the First Circuit have addressed similar statements when assessing whether the term "dinosaur" is evidence of pretext.  There is little uniformity among the courts, however, and the conclusions reached largely are based on the context in which the statements were made.  See Bunk v. Gen. Servs.

does not convey an age-related message.  Rather, as defined by Merriam-Webster, "dinosaur" means "impractically large, out-of-date, or obsolete."  <u>Merriam</u>-<u>Webster's</u> Collegiate Dictionary 326 (10th ed.

<u>Admin.</u>, 408 F. Supp. 2d 153, 158 (W.D.N.Y. 2006) (employer's use of the term "dinosaur" in reference to a co-worker's age not sufficient evidence of discriminatory intent, and are merely stray remarks); <u>Aylward</u> v. <u>Hyatt Corp.</u>, No. 03 C 6097, 2005 WL 1910904, at *18 (N.D. Ill. Aug. 5, 2005) (isolated remark by employer that there were "dinosaurs" that he would not mind seeing leave, without specific reference to plaintiff-employee, made months before plaintiff-employee's termination, was insufficient to raise a question of fact on the issue of pretext); <u>Cochrane</u> v. <u>Norton</u>, No. C-01-2208-SC, 2003 WL 21768006, at *4 (N.D. Cal. July 28, 2003) (joke comparing employment division to "an amusement park filled with dinosaurs" was insufficient to establish pretext, and even if it were to suggest age-based animus, such an ambivalently uttered comment would constitute "at best weak circumstantial evidence"); <u>Facciponti</u> v. <u>Wood Co.</u>, No. 98-CV-4025, 1999 WL 1073618, at *6 (E.D. Pa. Nov. 12, 1999) (evidence that company management likened employee to a "dinosaur," where the record contained virtually no other evidence of age discrimination, was insufficient to establish pretext); <u>Berkowitz</u> v. <u>Allied Stores of Penn-Ohio, Inc.</u>, 541 F. Supp. 1209, 1219 (E.D.Pa. 1982) (reference to employee as having been around "since the dinosaurs roamed the earth," where employee had long tenure with the company, insufficient to establish pretext or discriminatory animus); <u>but</u> <u>see</u> <u>Lewis</u> v. <u>Home Depot U.S.A., Inc.</u>, No. A-06-CA-058-LY, 2007 WL 1100422, at *6-8 (W.D. Tex. April 10, 2007) (where employer made repeated comments referring to "over the hill" employees, stating "I just can't stand to be around old people," and "the dinosaurs are going away" and "the dinosaurs are going extinct," references were more than stray marks and instead evidenced pretext); <u>Tsakonas</u> v. <u>Nextel Commc'ns, Inc.</u>, No. 04-CV-1363, 2006 WL 2527998, at *4 (D.N.J. Aug. 31, 2006) (denying summary judgment where, among other evidence presented on issue of pretext, employer referred to employee as a "dinosaur"); <u>McInnis</u> v. <u>Town of Weston</u>, 375 F. Supp. 2d 70, 77 (D. Conn. 2005) (where employer referred to certain employees as "dinosaurs" and "the old guys," and stated he wanted to "get rid of the old guys and hire young ones," such remarks were not stray remarks and instead were sufficient to defeat summary judgment); <u>Kult</u> v. <u>Deluxe Corp.</u>, No. 00CV2525MJDJGL, 2002 WL 826412, at *4 (D. Minn. April 26, 2002) (summary judgment precluded where evidence established that a company's hiring managers viewed older employees as "dinosaurs" and where discriminatory hiring practices were evident).

2002). This definition comports entirely with Sommer's explanation, corroborated by witnesses, that his statement referred to the out-dated practices and machines still used in the Puerto Rico factories. Given the context of Sommer's statement - made during a manager assimilation meeting at Old San Juan's Hard Rock Café, in response to an inquiry as to how corporate headquarters viewed GE's Puerto Rico operation, and without any reference to any specific employee and his or her age - this comment amounts to little more than a stray remark insufficient to establish discriminatory animus. See Velasquez-Fernandez, 476 F.3d at 11-12 ("stray workplace remarks . . . normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus").

Torrech admits that Sommer's dinosaur reference "by itself does not suggest more than Sommer's feeling toward older employees in general." He posits, however, that the comment, Sommer's desire for change, and an alleged series of appointments of younger employees, including his own replacement by a man nearly twenty years his junior, supports an inference of age discrimination. In his briefs, Torrech asserts that in Sommer's first four months as President and General Manager of Caribe GE, he decreased the average age of plant manager from forty-one to thirty-four. Aside from Torrech's replacement by a man in his early thirties, Torrech does not provide evidentiary support for his assertion. Torrech seemingly admits, however, that there was no policy, whether

explicit or implicit, of excluding employees over the age of forty or otherwise favoring employees under that age.[9] Instead, Torrech asserts that if appointments of individuals over the age of fifty were made, Sommer was not responsible for them.

At the end of the day, Sommer's personal appointment history is of little importance - what is telling, however, is Torrech's failure to deny that many high-level appointments of individuals within the protected class[10] were made in the Puerto Rico organization during the relevant time frame.[11] On the whole, while Torrech attempts to paint himself a part of a pattern of discriminatory conduct, his efforts are unsuccessful. Rather, the

---

[9] On the contrary, Torrech asserts that Sommer's oldest personal appointee to plant manager was forty-two years old.

[10] The Age Discrimination in Employment Act protects persons forty years of age or older. See 29 U.S.C. § 631(a).

[11] GE's Statement of Uncontested Facts submitted to the District Court contained three separate paragraphs in which GE listed, individually, each of Sommer's plant manager appointments since he became President and General Manager of Caribe GE, including the age of each appointee, as well as appointments made to positions at the same level as or higher than plant manager, along with the ages of said appointees, as well as Sommer's appointments outside of Puerto Rico, of employees in their forties, fifties, and sixties. In his Counterstatement, Torrech makes a blanket denial of all three paragraphs of GE's Statement of Undisputed Facts. In support, Torrech simply declares that since Sommer's arrival he has not appointed any plant manager over the age of forty-two, and that other appointments of older individuals, if made, were not done by Sommer. Torrech's record citations on these issues do not support his contentions and his blanket, factually unsupported denial does not create a material dispute of fact. Furthermore, even a denial does not suffice to establish, as Torrech attempts, a series of appointments of younger individuals at or around the time of Torrech's resignation.

record is devoid of evidence to support any discriminatory behavior on the part of GE.  On these facts, Torrech cannot show that GE's acceptance of his resignation was pretextual.

### IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's grant of summary judgment as to Torrech's ADEA claims.  Supplemental state law claims remain dismissed without prejudice.

**<u>Affirmed</u>**.