# United States Court of Appeals
## For the First Circuit

No. 13-2188

FOODMARK, INC.,

Plaintiff, Appellee,

v.

ALASKO FOODS, INC.,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]


Before

Thompson, Stahl, and Kayatta,
Circuit Judges.


Robert L. Hamer, for appellant.
Peter S. Brooks, with whom Zachary W. Berk and Saul Ewing LLP,
were on brief, for appellee.


October 1, 2014

**THOMPSON, Circuit Judge.** Appellant Alasko Foods, Inc. ("Alasko") and appellee Foodmark, Inc. ("Foodmark") wage a pitched battle over the meaning of certain provisions in their "U.S. Representation Agreement [and] Sales Management Agreement," which governed their nearly five-year relationship. The district court found that, in accordance with its contractual obligations, Alasko owed Foodmark a "Non-Renewal Termination Fee" when it decided to part ways with Foodmark. Having so concluded, the district court granted Foodmark's motion for summary judgment, and Alasko appealed. At stake is approximately $1.1 million. Although Alasko attacks the district court's decision on a multitude of fronts, Alasko's contractual obligations are clear, and the record reveals no genuine issue of fact for trial. Accordingly, we affirm.

## I. BACKGROUND

The underlying facts are generally undisputed. We set them forth in the light most favorable to Alasko as the non-moving party, Rivera-Colón v. Mills, 635 F.3d 9, 10 (1st Cir. 2011), reserving some for our discussion of the parties' specific legal arguments.

Foodmark is a Massachusetts corporation that assists food manufacturers in marketing "branded-label" and "private-label" products to retailers.[1] Alasko is a Canadian corporation

---

[1] The parties inform us that a "branded-label food" product appears on store shelves under its manufacturer's name. A "private-label food" product, by contrast, bears a name differing

-2-

headquartered in Montreal, Québec that sells frozen fruit and vegetables to retail outfits. Sometime in 2006, Foodmark approached Alasko to discuss the possibility of marketing Alasko's products in the United States, a market Alasko had yet to tap into. After a period of negotiation, on July 20, 2007, the parties signed a "U.S. Representation Agreement [and] Sales Management Agreement" ("Agreement").

**1.  Terms of the Agreement**

Alasko retained Foodmark to provide "private label sales management" and act as its "exclusive private label sales management team" with respect to "Target Accounts," which consisted of supermarkets and so-called "club stores" in the United States. See Agreement §§ 1-4. Foodmark was to manage sales of Alasko's frozen fruit and vegetable products, referred to in the Agreement as "Product Lines." Agreement § 2. The Agreement sets forth the scope of Foodmark's duties as follows:

> 5.    [Foodmark's]   Responsibilities    and
> Obligations:
>
> a.  To exclusively represent [Alasko] and the designated Product Lines to the Target Accounts within the Territory;
>
> b.   To review and to familiarize its staff with all facets of the current product line, production costs and margin requirements;

from that of its manufacturer.

-3-

> c. To manage and/or appoint brokers and insure [sic] that the product line is presented to the specified Target Accounts;
>
> d. If necessary, to process all orders from accounts and brokers, including EDI when applicable;
>
> e. To assume all normal expenses in the performance of its assigned responsibilities (includes entertainment, travel, food and lodging);
>
> f. To hold in strictest confidence all information deemed to be sensitive (includes product composition, manufacturing procedures, distribution methods and customer lists)[.]

Agreement § 5. In exchange, Alasko promised to pay Foodmark a "Management Fee" of 5% of "the net invoice sales of all Products" in the United States.[2] Agreement §§ 6.e, 7.a.

But Foodmark's compensation was not limited to its management fee. Alasko agreed that, under certain circumstances, it would pay Foodmark a "termination fee" at the end of their business relationship. Although the Agreement provides different mechanisms for ending the parties' work together, we need only concern ourselves with those few sections applicable here.

The Agreement broke the parties' relationship into terms of one or three years that would renew automatically unless either party notified the other of its intent not to renew. Section 11,

---

[2] Alasko further agreed that it would compensate "all brokers" with a "3% Broker Commission based on the net invoice sales of all Products." Agreement §§ 6.f, 7.b.

-4-

inserted at Alasko's behest, allowed it to terminate the Agreement during the middle of any term upon ninety-days notice.  Agreement § 11.  Should it "elect[] not to renew the Agreement for any 3-year term," Alasko would pay Foodmark a "Non-Renewal Termination Fee."  Agreement § 10.d.  This fee was to be calculated "based on the net invoice sales for the last 13-week period of the term, annualized, for accounts managed by [Foodmark]."  Agreement § 10.f.  As applicable here, the Termination Fee amounted to 10% of Alasko's sales up to $10 million, 8% of sales between $10 million and $25 million, and 6% of sales over $25 million.  Agreement § 10.f.

The Agreement also envisioned a circumstance in which Alasko could end its relationship with Foodmark without owing a termination fee.  Section 13, "Breach of Agreement," provides each party the right to terminate if the "other party defaults in the performance of any material obligation hereunder or materially fails to comply with any provision of this Agreement or materially breaches any representation contained herein."  Agreement § 13.  Unlike Section 10, Section 13 makes no provision for a termination fee.

**2.  The Agreement's Life and Death**

With the Agreement in place, Foodmark started trying to secure United States buyers for Alasko's products.  It began by familiarizing itself with Alasko's products, capabilities, and strategies.  It then "engaged in discussions [with Alasko] about

the best course of action for U.S. sales and decided to pursue retail private label sales." Having charted this course, Foodmark analyzed the relevant market, made appointments with retailers to present Alasko's products, and obtained feedback from its own pre-existing clients to determine whether any of Alasko's products needed "fine-tun[ing]" before being put on the market. All told, Foodmark peddled Alasko's products to twenty-two retailers in the United States, all at its own expense.

By December 2007, Foodmark had brought in a broker, TBG, LLC ("TBG"), to assist it in pitching Alasko's products to Sam's Club, a major United States retailer.[3] At some point (the record does not disclose exactly when), Foodmark decided it would introduce TBG to Alasko. In July 2009, Sam's Club committed to purchase private-label frozen food from Alasko. Alasko subsequently entered into a direct Brokerage Agreement with TBG for its new Sam's Club account.[4]

The Brokerage Agreement sets TBG up as Alasko's "broker" with respect to Alasko's sales to Sam's Club. See Brokerage Agreement § 1 and Schedule A. Its specific obligations were spelled out as follows:

---

[3] TBG is an American company and is headquartered in Fayetteville, Arkansas.

[4] The Brokerage Agreement also contemplated sales to Wal-Mart, Inc. Any such sales--the record does not reveal whether or not there were any--are irrelevant to the issues we must decide.

> [TBG] shall maintain a business organization and workforce adequate in every way to:
>
> A. Regularly contact its Accounts' buying office;
>
> B. Diligently and with reasonable frequency solicit and promote the sales of all [Alasko] Products.
>
> C. Work diligently at an acceptable frequency to secure orders from [Alasko's] Accounts listed in Schedule A [i.e., Sam's Club and Walmart] attached hereto.
>
> D. On sales of Products on orders submitted by Broker and accepted by [Alasko], Broker will lend complete and regular assistance in effecting prompt and full payments by customers for all deliveries of Products sold; and
>
> E. Broker agrees to adhere to [Alasko's] schedule of prices, terms, and conditions of sale, and to submit orders taken under these conditions to [Alasko] for approval in the routine manner; and
>
> F. Meet sales goals and objectives for the business.

Brokerage Agreement § 4. TBG further agreed to assist Alasko with "any customer disputes, inquiries or deductions," "product problems, product withdrawals or recalls," and collections. Brokerage Agreement § 9A.

The Brokerage Agreement does not state TBG will "manage" any accounts, assume any sort of "management role" over anything, or seek to secure new accounts. Neither was TBG declared to be a "sales management team" like Foodmark. And Alasko agreed to pay TBG a 3% broker fee (not a "management fee") based on Alasko's net

-7-

sales to the Sam's Club account. Brokerage Agreement § 7 and Schedule C. This fee, we note, is equal to the 3% broker fee contemplated by Foodmark and Alasko's Agreement.

Alasko subsequently renegotiated Foodmark's management fee on the Sam's Club account, and Foodmark ultimately accepted a reduced fee of 2%.[5] Alasko began shipping products to Sam's Club in October 2010. It sent Foodmark management fees, calculated from Alasko's sales to Sam's Club, in the months that followed.

Meanwhile, private equity firm Catterton Partners acquired a controlling interest in Alasko in July 2010. At the request of the new owners, Foodmark ceased its work--for the most part--while the company reconsidered its United States sales strategy.[6] On October 17, 2011, Alasko informed Foodmark it had opted, pursuant to Section 11, to terminate the Agreement as of January 15, 2012. Alasko did not say that Foodmark had failed to perform any of its contractual obligations, nor did it mention Section 13's provisions governing termination for cause.

Alasko continued to pay Foodmark's management fee for the Sam's Club account through the end of their relationship. Payments

_____

[5] Although the parties do not agree on the reasoning behind this reduction, the disagreement is immaterial because it is uncontested that Alasko continued to pay Foodmark a management fee (albeit a reduced one) with respect to the Sam's Club account, even after the renegotiation.

[6] Foodmark asserts it continued to present Alasko with new business opportunities, a claim to which Alasko has not responded.

between the notice of termination and January 15, 2012, amounted to $56,329.72.  Over the entire life of the Agreement, Alasko paid Foodmark a total of $205,509.00 in management fees, all of which related to the Sam's Club account.

After receiving the notice of termination, Foodmark demanded payment of the Non-Renewal Termination Fee contemplated by Section 10.f, but Alasko refused.

## 3.  The Litigation

Unwilling to surrender, Foodmark filed a two-count complaint in Massachusetts state court.  Count 1 alleged that Alasko's refusal to pay the termination fee constituted a breach of the Agreement and of its covenant of good faith and fair dealing. Count 2 requested relief under the business-to-business provisions of Massachusetts's consumer protection statute.  Alasko removed the case to federal court on the basis of diversity jurisdiction.  The parties proceeded to bombard the district judge with a flurry of dispositive motions and cross-motions.

Alasko sought summary judgment on all counts, arguing that its termination of the Agreement in the middle of a three-year term pursuant to Section 11 did not trigger its obligation to pay a termination fee.  Foodmark returned fire with its own cross-motion, asserting that regardless of whether Alasko ended the Agreement during or at the end of a term, Foodmark was entitled to a termination fee because Alasko had opted not to renew the

Agreement. The district court--whose reasoning is not germane here--sided with Foodmark and permitted the parties to conduct limited discovery on damages.

Foodmark filed a follow-up summary judgment motion, this time seeking $1,101,275.45 in damages based on Alasko's sales to Sam's Club during the final thirteen weeks of the Agreement. Alasko resisted, arguing Foodmark was not entitled to anything because it did not actually manage the Sam's Club account, as the Agreement required. The district court rejected Alasko's arguments, found that Foodmark did "manage" the Sam's Club account, and entered judgment awarding Foodmark $1,101,275.45.

Refusing to admit defeat, Alasko's timely appeal followed.[7]

---

[7] We note a jurisdictional wrinkle not mentioned by the parties. Foodmark's summary judgment motions raised only the first count of its two-count complaint. The district court's judgment, however, resolved all questions of liability and damages, and imposed pre- and post-judgment interest. This disposed of the case in its entirety and left nothing further for the district court to do. For its part, Foodmark affirmatively relied on the judgment's finality by applying for a writ of execution.

There is no doubt that the district court entered final judgment in Foodmark's favor. See In re Forstner Chain Corp., 177 F.2d 572, 576 (1st Cir. 1949) ("A final judgment is the concluding judicial act or pronouncement of the court disposing of the matter before it . . . ."); see also Hickey v. Duffy, 827 F.2d 234, 237-38 (7th Cir. 1987) (finding jurisdiction over an appeal where the district court "believe[d]" a particular ruling ended the litigation). Accordingly, we have jurisdiction over this appeal. See 28 U.S.C. § 1291 (limiting our appellate jurisdiction to "final decisions of the district courts").

## II. **STANDARD OF REVIEW**

Although the Agreement's choice of law provision implicates the substantive law of Québec, where foreign substantive law applies we nonetheless utilize our own procedural rules.  See Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc., 145 F.3d 463, 478 (1st Cir. 1998).  Accordingly, we review "the district court's grant of summary judgment . . . de novo, and we draw all reasonable inferences in favor of the nonmoving party." Ponte v. Steelcase, Inc., 741 F.3d 310, 319 (1st Cir. 2014).  We affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III. **ANALYSIS**

On appeal, Alasko does not contest the district court's allowance of Foodmark's first motion for summary judgment, or the denial of its own.  Rather, it only challenges the district court's resolution of Foodmark's second summary judgment motion on damages.

Before diving into our analysis of the Agreement, we briefly set forth the controlling legal principles.

### 1. Contract Interpretation Under Québec Law

The parties agree that Québec law governs their contractual obligations, and we see no reason to disturb this choice.  See Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013) (forgoing choice of law analysis where the parties

agreed to utilize the substantive law of a particular jurisdiction and there was "at least a reasonable relationship between [their] dispute" and that jurisdiction). Each party has submitted an affidavit from a Québec legal practitioner setting forth the substantive rules of law, which is an appropriate method of proving the law of a foreign country. See Elec. Welding Co. v. Prince, 86 N.E. 947, 948 (Mass. 1909) ("The proof of the law of a foreign country may be by the introduction in evidence of its statutes and judicial decisions, or by the testimony of experts learned in the law, or by both."); Evans Cabinet Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 143-44 (1st Cir. 2010) (applying Québec law as set forth in the affidavit of a Canadian attorney).

After carefully reviewing the parties' submissions, we find their views of Québec law are substantially similar. We do not hesitate, however, to supplement their submissions with our own research, where necessary.

Our ultimate goal under Québec law is to give effect to the contracting parties' intent. To that end, "[t]he common intention of the parties rather than adherence to the literal meaning of the words shall be sought in interpreting a contract." Civil Code of Québec, S.Q. 1991, c. 64 ("Code"), art. 1425 (Can). Although the parties do not contend their Agreement is ambiguous,

-12-

we are permitted to refer to the Code's principles to guide our analysis of their contractual obligations.[8]

When dealing with contractual language, each individual "clause . . . is interpreted in light of the others so that each is given the meaning derived from the contract as a whole." Code art. 1427. "A clause is given a meaning that gives it some effect rather than one that gives it no effect." Code art. 1428. Should there be any doubt, "a contract is interpreted in favour of the person who contracted the obligation and against the person who stipulated it." Code art. 1432.

Further, we may take into account "the nature of the contract, the circumstances in which it was formed, [and] the interpretation which has already been given to it by the parties." Code art. 1426. And we can also look to the parties' "usage," that is, the manner in which they have performed. Id.

With these underlying principles in mind, we soldier on.

---

[8] This is where the parties' interpretations of Québec law diverge. Foodmark tells us we may resort to the Code's principles even where a contract is not ambiguous, but Alasko would have us forgo their use altogether unless we find ambiguity in the Agreement. The authority Alasko cites in favor of this proposition does not go so far, providing only that we may not vary or alter the terms of an unambiguous agreement under the guise of interpretation. See Aff. of Peter S. Martin, ¶ 3. This says nothing about incorporating the Code's underlying principles into our determination of contractual obligations, and we accept Foodmark's essentially uncontested view of Québec law on this point.

**2. Did Foodmark Manage the Sam's Club Account?**

Alasko begins by arguing Foodmark was required to perform "all" of its contractual obligations in order to have "managed" any particular account. According to Alasko, Foodmark's "obligations under Section 5 of the Agreement . . . were collectively deemed to comprise account management." Appellant Br. at 11.[9] Foodmark does not contest this proffered definition, and so we adopt it for purposes of this appeal.

This brings us to the central issue in this case: whether there is a disputed issue of fact with respect to Foodmark's "management" of the Sam's Club account. We address the parties' arguments in turn, providing necessary details as we go along.

### i. TBG's Involvement with the Sam's Club Account

Alasko's front-line argument is that no termination fee is owed because TBG, not Foodmark, managed the Sam's Club account. Foodmark, however, says that bringing TBG on-board was consistent with its own contractual duties to "manage" that account.

---

[9] Alasko separately raises the concept of "conjunctive obligations." See Appellant Br. at 15. A "conjunctive obligation . . . is an obligation where the debtor is required to perform several duties." Jean-Louis Baudouin, Pierre-Gabriel Jobin & Nathalie Vézina, Les obligations § 605 (7th ed. 2013) (Appellant's Translation). See Addendum to Appellant Br. at 47. Because the parties' accepted definition of "manage" as collectively comprising Foodmark's Section 5 duties embraces this notion, we need not consider it separately.

The Agreement expressly provides for Foodmark's appointment of brokers for the accounts it landed, and for brokers to oversee the day-to-day handling of those accounts. Agreement § 5.c. Foodmark's hands-off responsibilities with respect to any particular broker-run account are obvious, as Foodmark was required to "process all orders from accounts and brokers" only "[i]f necessary." Agreement § 5.d. The Agreement also calls for a 3% broker fee, which is exactly what Alasko agreed to pay TBG with respect to the Sam's Club account. Agreement § 7.b. Thus, the parties plainly envisioned Foodmark working with or through a broker on any U.S. account it secured.

Furthermore, comparing Foodmark's responsibilities to TBG's shows the two companies fulfilled quite different roles for Alasko. The Brokerage Agreement limited TBG's obligations to the Sam's Club Account itself.[10] Foodmark's job, on the other hand, was to go out and pitch Alasko's products to numerous United States vendors in order to drum up business and secure new accounts for Alasko. It was also tasked with managing any brokers brought in to handle these new accounts to ensure their performance was up to par.

---

[10] The Brokerage Agreement also made TBG responsible for Alasko's sales to Walmart. The record does not reveal whether Alasko ever sold any products to Walmart, but whether or not it did does not affect our analysis.

-15-

In sum, Foodmark was involved in Alasko's "big picture" business concerns in a way TBG simply was not. That TBG provided broker services on the Sam's Club account was foreseen by and entirely consistent with Foodmark's own management responsibilities. Nothing in the Agreement's clear language precluded both Foodmark and TBG from fulfilling their own, unique obligations with respect to the Sam's Club account. We conclude, therefore, that TBG's involvement did not preclude Foodmark from managing the account within the meaning of the Agreement.[11]

This determination, however, does not get us through the battle lines: we must still answer the final question of whether there is a triable issue as to whether Foodmark actually managed the Sam's Club account within the meaning of the Agreement. Our march continues.

### ii. The Parties' Course of Conduct

As we hone in on our objective, we consider the evidence as to how the parties performed under the Agreement and how they interpreted their responsibilities during the course of their business relationship. See Code art. 1426.

Foodmark argues the undisputed evidence demonstrates Alasko recognized its management of the Sam's Club account because

___

[11] Ironically, but for this conclusion, Alasko's reference to TBG "managing" the account would be akin to admitting it breached its promise to utilize Foodmark as its "exclusive" sales management team on U.S. accounts.

it paid Foodmark's management fee without complaint, even after TBG entered the scene. Alasko, however, explains that the Agreement entitles Foodmark to management fees with respect to all of Alasko's sales in the United States (even if it did nothing to bring about a particular sale), but that Foodmark only gets a termination fee for accounts it affirmatively managed. Thus, Alasko would have us find that its payment of management fees does not by itself mean that Foodmark managed the Sam's Club account.

Alasko's position must give way in the face of the Agreement's plain language and the uncontested evidence in the record. For starters, Alasko's argument is irreconcilable with its proffered definition of "management," to wit, fulfillment of every one of Foodmark's Section 5 responsibilities. The idea that "management" could mean Foodmark did not have to do anything to earn management fees (which ultimately exceeded $200,000) defies all bounds of common sense and commercial logic, and is contrary to the plain meaning of the Agreement. Indeed, this construction reads the bargained-for nature of Foodmark's duties out of the Agreement and runs afoul of the Québec Civil Code's admonition to interpret contractual language in a way "that gives it some effect rather than one that gives it no effect." Code art. 1428.

And apart from being inconsistent with the Agreement's language, Alasko's position is flatly contradicted by the uncontested evidence in the record. There is no dispute that

Alasko continued to pay Foodmark's "management fee" (albeit reduced to 2% from the originally-agreed-upon 5%) with respect to the Sam's Club account after it entered into its Brokerage Agreement with TBG. Alasko never gave Foodmark any notice of nonperformance, nor did it seek to terminate the Agreement for cause, as would be expected had Alasko felt Foodmark was not providing the services required of it and which would have relieved Alasko of any obligation to pay a termination fee. See Agreement § 13. Thus, we reject Alasko's implication that it would have paid Foodmark more than $200,000 for no work.

What's more, Alasko has turned a blind eye to the commercial reality that it did not have any United States sales before hiring Foodmark as its exclusive sales management team. Given this exclusivity provision, any U.S. sales Alasko realized would likely have been procured through Foodmark's work. Yet, throughout this appeal Alasko ascribes no value at all to Foodmark's contributions towards developing the Sam's Club account, an account which Alasko does not dispute is expected to generate approximately $10 million in annual sales. Nothing in the record suggests--nor does Alasko argue--that it would have realized any United States sales but for Foodmark's groundwork at the beginning of their relationship and its later introduction of TBG.

All told, the undisputed evidence demonstrates Alasko acknowledged Foodmark's management role with respect to the Sam's

Club account. And as we discuss below, there is no evidence in the record from which to draw a contrary conclusion, as would be necessary to raise a genuine issue of fact for trial.

### iii. Uncontested Evidence of Management

Alasko does not contest any of Foodmark's evidence showing that it spent time familiarizing itself with Alasko's products, that it conducted market research and met with Alasko and its own clients to discuss sales strategy and the competitiveness of Alasko's offerings, and that it ultimately presented Alasko's products to twenty-two retailers in the United States. Alasko admits Foodmark introduced it to TBG, and the uncontested evidence is that Alasko landed the Sam's Club account sometime after TBG became involved. All of these activities are plainly within the scope of Foodmark's Section 5 duties.

Furthermore, the record reveals that Foodmark's work with TBG was directed specifically at Sam's Club. This evidence comes in the form of affidavits from Foodmark employees describing just what Foodmark did on Alasko's behalf, along with email communications between Foodmark and TBG appended to each affidavit. Alasko has not contested the authenticity or contents of any of these emails.[12]

---

[12] The closest Alasko comes is its submission of two conclusory affidavits from TBG employees stating that Foodmark played no role in the day-to-day management of the Sam's Club account. These do not suffice to create a genuine issue of fact in light of Alasko's failure to contest the information contained in Foodmark's email

Foodmark's affidavits and emails span 126 pages of the summary judgment record. The emails were exchanged both before and after TBG entered into its Brokerage Agreement with Alasko. They show that Foodmark was actively involved with product packaging, product pricing, and delivery of sample products, and that it coordinated meetings and assisted TBG's presentations. They also detail Foodmark's market research into the activities and pricing strategies of competing companies. All of these activities directly related to the Sam's Club account. Furthermore, the emails detail Foodmark's and TBG's attempts to establish a separate account with Walmart. Thus, the uncontested evidence demonstrates Foodmark played a role in managing TBG, as provided for by the Agreement.

Alasko marshals one final effort to get around the Maginot Line presented by the uncontested evidence. The evidence in the record here provides a much more effective defense than did France's physical bulwarks.

---

communications. See Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008) (recognizing "unsupported, subjective, conclusory, or imaginative statement[s]" do not create a factual dispute at the summary judgment stage). Moreover, given our conclusion that Foodmark and TBG each had different business responsibilities, TBG's opinion that Foodmark did not manage the Sam's Club account on a day-to-day basis is not inconsistent with a finding that Foodmark managed the account within the meaning of the Agreement. We reject Alasko's argument that these affidavits present an issue for trial.

Alasko says that the parties' renegotiation of Foodmark's management fee from 5% to 2% of sales to Sam's Club is indicative of Foodmark's "vastly diminished role--something far less than account management--relative to this particular account." Appellant Br. at 11. But the renegotiation only strengthens the conclusion that Foodmark continued to manage the account. A diminished management role remains, by definition, a management role. And the fact that the parties did not simultaneously negotiate any alteration to the termination fee buttresses our conclusion that Alasko recognized Foodmark continued to "manage" the Sam's Club account within the meaning of the Agreement, despite the renegotiation.

## IV. CONCLUSION

After cutting through the fog of war, we find that the uncontested evidence in the record demonstrates both that Foodmark fulfilled its Section 5 duties with respect to the Sam's Club account, and that Alasko recognized its management role even after concluding the Brokerage Agreement with TBG. Accordingly, there is no genuine issue of fact for trial, and Foodmark is entitled to a termination fee in the amount calculated by the district court.

**Affirmed**.