Doris ORTIZ–RIVERA, Plaintiff,

v.

ASTRA ZENECA LP, Defendant.

Civil No. 07–1203 (FAB).

United States District Court,
D. Puerto Rico.

Feb. 9, 2009.

Jorge Carazo–Quetglas, Carazo Quetglas Law Office, Guaynabo, PR, for Plaintiff.

Ana B. Rosado–Frontanes, Carl E. Schuster, Lourdes C. Hernandez–Venegas, Schuster & Aguilo LLP, San Juan, PR, for Defendant.

**OPINION AND ORDER**

FRANCISCO A. BESOSA, District Judge.

On August 22, 2008, defendant Astra Zeneca LP ("AZ") filed a motion for summary judgment in which it requested the dismissal of all claims pending against it (Docket No. 38). Plaintiff Doris Ortiz–Rivera ("Ortiz") opposed summary judgment on September 26, 2008 (Docket No. 46). AZ replied to Ortiz–Rivera's opposition brief on October 30, 2008 (Docket No. 70). Ortiz–Rivera, in turn, filed a sur-reply to AZ's reply brief on November 18, 2008 (Docket No. 88).

AZ also submitted two motions to strike exhibits to Ortiz's opposing statements of material facts on October 17, 2008, and October 21, 2008 (Docket Nos. 58 & 60, respectively). The motions to strike were opposed by Ortiz on October 21, 2008, and October 25, 2008 (Docket Nos. 59 & 67, respectively).

For the reasons provided below, the Court **DENIES** AZ's motions to strike and **GRANTS** AZ's motion for summary judgment.

## I. Motions to Strike

AZ moves the Court to strike various of the exhibits supporting Ortiz's opposition to summary judgment for failure to comply with Fed.R.Civ.P. 26, for containing hearsay, and for failing to contain certified English language translations for non-English language documents.[1] The Court **DENIES** AZ's motions to strike because the inclusion of the exhibits in the record do not alter the Court's analysis of the motion for summary judgment and the Court prefers to decide upon as complete a record as possible. The Court notes, however, that many of the attached exhibits such as Doctor Ramon O. Fortuño Ramirez's Expert Report were irrelevant to the Court's analysis of the summary judgment motion. Those suggested facts put forth by the parties in their Local Rule 56 statements which were irrelevant to the Court's analysis were not included in the factual background provided below.

## II. Factual Background

### A. General Background

Plaintiff Ortiz was born on January 17, 1966. Defendant AZ, a pharmaceutical company that develops and manufactures medicines, hired Ortiz on August 8, 2005, about five months shy of her fortieth birthday. AZ hired Ortiz to be a pharmaceutical sales specialist ("PSS"), a person who

---

1. The translations have since been filed for the exhibits originally filed without certified English language translations. (Docket No. 83.)

represents AZ in the field by providing information to health care providers and hospitals and by distributing product samples. During her entire tenure with AZ, Ortiz worked as a PSS in the Puerto Rico field sales team which is divided up into five districts. Ortiz reported to Vanessa Gonzalez[2] ("Gonzalez"), her District Sales Manager ("DSM") (and immediate supervisor), who in turn reported to Elsa Saavedra[3] ("Saavedra"), the Regional Sales Director for Puerto Rico.

Both Gonzalez and Saavedra were involved in hiring Ortiz, a process that involved two interviews. Ortiz first interviewed with three DSMs: Mercedes Sauzo, Arnaldo Torres and Gonzalez, the last of whom had an opening in her district team. Ortiz interviewed second with Saavedra alone. After the second interview Saavedra met with the three DSMs and together they decided to hire Ortiz.

As a PSS, Ortiz was required to work seven and one half hours a day. AZ's work expectations state that all PSSs should spend at least 210 days making "calls" upon prescribers in their assigned territory. "Calls" are defined as a face-to-face dialogue with one or more prescribers, including a full "product discussion." AZ defines "product discussions" as one in which the PSS utilizes an "approved" visual aid and/or clinical paper to address the customer's needs, and during which the most current promotional message is persuasively delivered. Ortiz was trained to provide sales calls of different lengths, including one as short as thirty seconds, depending upon the amount of time that a physician would dedicate to her.

AZ provided Ortiz, as well as all other PSSs, with a handheld electronic device ("NEC") used to record information concerning the sales calls, such as the time and date of the visit, the time when the healthcare provider signed for a product sample, and a summary of the discussion held with each physician. PSSs were required to synchronize the NEC on a daily basis with the AZ network through company provided laptops. PSSs were not supposed to cut and paste the summary description from one visit into another, an action called "mass assignment," outside of certain circumstances such as if the PSS experienced computer difficulties.

As part of their promotional efforts, AZ enables PSSs to provide healthcare professionals with lunch while engaging in a discussion concerning an AZ product or a topic related to the healthcare professional's practice of medicine. These events are referred to as a "lunch and learns" or "access meals" and they are governed by standards promulgated by AZ. Only a healthcare professional and his or her staff are allowed to attend the lunches.

### B. Events underlying Ortiz's termination

Ortiz received a law degree in July 2004. Nonetheless, she omitted the degree from the résumé and the application form that she submitted to AZ. Ortiz explains that the degree was omitted from her résumé because she turned in an older résumé that she did not have time to update with her law degree. She explains that her degree was omitted from the application form because the form did not specifically request information about a law degree.[4]

2. Gonzalez was born August 15, 1970.

3. Saavedra was born November 3, 1957.

4. The application form in question contained a section entitled "educational data" and a subsection entitled "college/university" with the same fields repeated five times to allow for the candidate to include information per-

Ortiz says that she informed Gonzalez that she had a law degree on October 27, 2005, once she was already employed by AZ, and that Gonzalez congratulated her at that time.

In February, 2006, Gonzalez became aware that earlier that same month, on February 3, Ortiz conducted a "lunch and learn" at Doctor Jose Rivera Del Rio's office. Ortiz ordered lunch for ten people although there were fewer than nine people at the office including the doctor and his staff. A similar thing had occurred once before with Doctor Octavio Jordan. When confronted about the inaccuracy by Gonzalez on February 27, Ortiz said that she had made a mistake. Apparently, Ortiz ordered food on both occasions from a restaurant that only provides takeout for 10 people or more. On the first occasion Ortiz asked someone in Doctor Jordan's office if lunch for ten was acceptable, and she was told yes, but she did not verify the number of staff in that doctor's office. Then on the second occasion, with Doctor Rivera Del Rio's office, Ortiz ordered again from the restaurant that only provides for a minimum order of ten and she did not verify the number of people in Doctor Del Rio's office.

Gonzalez contacted Saavedra and the human resources department to seek guidance as to how to proceed with what she saw as false information in an expense report. In March 2006, Saavedra and Gonzalez consulted with John Kriegsmann [5] ("Kriegsmann"), the Human Re-

sources Senior Employment Practices Partner at AZ for the Southeast United States, about their concerns with Ortiz (the reimbursement expense and the information omitted from the job application). Kriegsmann asked Gonzalez if she had carried out a customary six-month review of Ortiz's "work metrics" as a PSS. Once Gonzalez replied that she had not, Kriegsmann instructed her to conduct the review before taking any action with respect to Ortiz.

To conduct the six month review Gonzalez analyzed a "sample report," an activity call report, and a synchronization report. These reports included information concerning the doctors that Ortiz visited, such as the doctor's physical address, the type of visit, the time Ortiz spent at each office, a description of Ortiz's discussion with each doctor and the time that Ortiz received the doctor's signature to order samples.[6] Gonzalez concluded that out of a 47 work day period there were four days with no sample or call activity, five days with 0–2 hours of work, twenty days with 2–4 hours of work and five days with mass assignments. Ortiz counters that Gonzalez's conclusions were incorrect and asserts that Gonzalez should have reviewed other documents that were available to her at the time of her review. Ortiz also asserts that had Gonzalez reviewed the same documents for certain other PSSs, she would have found that those PSSs also had working patterns with many days that ap-

taining to different schools or different degrees. This section includes one question requesting the name of the degree and another asking if the particular degree is the candidate's "highest degree completed." Ortiz provided information concerning two degrees: (1) a "biology" degree that she completed in 1985 at the University of Puerto Rico and (2) a masters degree in English linguistics also from the University of Puerto Rico.

5. Kriegsmann was born on September 27, 1943.

6. AZ's PSSs do not directly distribute samples to doctors. Rather, after performing a "call" the PSS has the doctor sign for a specific number of samples which are then mailed to the doctor.

peared to be less than the required seven and one half hours.

Gonzalez also concluded that Ortiz engaged in a suspicious work pattern on certain days in which Ortiz obtained a high number of signatures for AZ samples within 3–5 minutes of each other from hard to access doctors who did not have offices on the same floor of the same building. Further, Gonzalez believed that the signatures were so close together in time that Ortiz would not have had the opportunity to provide each doctor with the obligatory product discussion associated with the sample in question. Saavedra conducted her own analysis of Ortiz's call and sample activity reports and she shared the same concerns as Gonzalez. Specifically she believed that Ortiz appeared to have sample signatures too close together to have been able to provide a full product discussion and that on other days Ortiz did not appear to work full days. Ortiz challenges the conclusion reached by Gonzalez and Saavedra. She asserts that the 3–5 minutes between sample signatures allowed her enough time to provide the targeted 30 second presentation that she was trained to provide. In addition, she also presents evidence that other PSSs obtained signatures of doctors in 3–5 minute intervals.[7]

Once Gonzalez and Saavedra completed their analyses of Ortiz's work history at AZ, they informed Kriegsmann of their findings. Kriegsmann instructed Gonzalez to discuss her concerns with Ortiz in a business conference, allowing Ortiz to address Gonzalez's concerns. On March 9 Gonzalez contacted Ortiz and told her that they were to have a meeting on March 13. Gonzalez also told Ortiz to bring her computer, NEC and agenda to the meeting. Gonzalez asserts that she told Ortiz that the meeting would be to discuss Ortiz's business while Ortiz says she was told the meeting was routine. Human resources provided Gonzalez with a list of sample questions which Gonzalez tailored to the information she extracted from Ortiz's reports.

At the March 13 meeting Gonzalez posed questions to Ortiz and Saavedra took notes of the meeting. Ortiz provided additional information in a letter submitted following the meeting, although she did so based upon her memory of the questions posed because she was not provided with a copy of the questions. Gonzalez and Saavedra concluded that Ortiz's answers were unsatisfactory and they recommended her termination to Kriegsmann. After reviewing the six-month work analysis, Saavedra's translated notes of the business conference, and Ortiz's written explanation of questions posed during the business conference, Kriegsmann concluded that Ortiz violated AZ policies on many occasions and he concurred with the recommendation from Gonzalez and Saavedra to terminate Ortiz's employment. Ortiz's employment was terminated the following day, March 17, 2006, at which time she was forty years old.[8]

---

7. Gonzalez and Saavedra provided two additional reasons to question Ortiz's performance. First, on March 8, 2006, Gonzalez joined Ortiz on a field visit to Dr. Herbert Rivera ("Dr. Rivera"). Based upon her observations, Gonzalez believed that Dr. Rivera did not know Ortiz even though AZ's records show that Ortiz already visited Dr. Rivera twice. Second, Ortiz called on physicians that were not on the AZ target list. Ortiz provides a statement from Dr. Rivera's secre-tary in which she states that Ortiz did meet with Dr. Rivera "during her visits." Regardless, neither of these reasons to question Ortiz's performance put forward by AZ are pertinent to the Court's analysis of the summary judgment motion.

8. The AZ standards of conduct provide that an employee may be disciplined up to and including termination of employment for, among other things, falsifying company docu-

Following Ortiz's termination, her position remained vacant for seven months until it was filled by Mariann Garcia ("Garcia"), who was thirty years old when she began her employment with AZ.[9]

### C. Allegations of discriminatory comments and suggested evidence of pretext

On January 3, 2006, Ortiz went to Gonzalez's home to pick up material relating to an AZ product.[10] At Gonzalez's home Ortiz told Gonzalez that she was "bleeding from [her] colon and that [she] had to see a doctor." (Docket No. 47–8, p. 46) Gonzalez told Ortiz to get treated and that "those things came with age." (*Id.*)

On February 16, 2006, Gonzalez and Ortiz attended a meeting in Rincon, Puerto Rico, related to a drug called Nexium. During a break in the meeting a co-worker of Ortiz began to sell bikinis. Gonzalez bought a bikini and was nearby the remaining bikinis that were for sale when Ortiz approached the seller and asked "is there a bikini for me?" (*Id.* at p. 48) Gonzalez told Ortiz that she "was too old for one, but still on time." Ortiz asserts that Gonzalez made this comment with a derogatory tone of voice while smiling.

On February 27, 2006, Gonzalez met with Ortiz to discuss the errors that Gonzalez had discovered in Ortiz's expense report. During the meeting Gonzalez told Ortiz "you are too old, Doris. You are too old for this. You are too old to be making these mistakes. This is unacceptable." (*Id.* at p. 51)

On March 13, 2006, Gonzalez and Saavedra met with Ortiz to discuss their concerns with her performance. At the meeting they discussed Ortiz's omission of her law degree from her résumé and from her application and they also discussed her expense report in which she listed ten people as having attended a lunch when fewer than ten people actually attended the lunch. Ortiz states that both Gonzalez and Saavedra told her that she "was old enough to know what it was to lie and to omit" information. (*Id.* at p. 52)

Ortiz did not report any of these four incidents upon which she rests her allegations of age discrimination to anyone at AZ in management or human resources in compliance with AZ's Equal Employment Opportunity Policy ("EEOP"). AZ's EEOP policy prohibits discriminatory conduct and provides for the investigation and taking of corrective measures regarding any discriminatory conduct prohibited by law. The policy directs that "[a]ny individual who feels that he or she has been subjected to conduct prohibited by this policy by any AstraZeneca manager, supervisor, co-worker ... should report the inappropriate conduct to AstraZeneca." (Docket No. 38–4, p. 7) AZ also has an "Open Door Procedure" which encourages employees to discuss any concerns with their managers or to take their concern to the next level of management if the employee prefers not to discuss a particular issue with his or her manager. (*Id.* at p. 9) During her training Ortiz was referred to AZ's intranet where the anti-discrimination policies are posted. She also received pamphlets with an overview of the anti-discrimination policy.

In her deposition Ortiz explained that she planned to file an internal complaint against Gonzalez but that AZ terminated

---

ments or records including employment applications and expense reports, and engaging in acts of dishonesty.

9. AZ offered employment to Garcia on September 22, 2006 and Garcia began her employment on October 30, 2006.

10. At this time Ortiz was still 39 years old.

her employment before she did so. Ortiz also adduces statements from herself and other former AZ employees in which they state that it was common knowledge among Puerto Rican employees of AZ that AZ ignored complaints of discriminatory conduct by supervisors, that AZ did not implement its own anti-discrimination policy in good faith, and that AZ did not take corrective measures against supervisors.[11] Ortiz also asserts that she did not utilize the internal reporting structure because the supervisors were isolated from higher management, there was no human resource employee based in Puerto Rico, supervisors were allegedly granted virtually complete authority over their subordinates, and supervisors directly controlled all aspects of an employee's day to day activities.

Ortiz also presents statements from other former employees of AZ who were unhappy with Gonzalez. Ramirez testified that he felt discriminated against on the basis of his age by Gonzalez. He also named three former AZ employees, including himself, who were all 40 or over and who he said left AZ after having problems with Gonzalez. Ramirez said that these three former employees were all replaced

by people who were under forty years of age. Negron stated that Gonzalez treated employees of her same age in a different way than she treated employees who were older than she. Neither Negron nor Ramirez, however, explained with any detail how they were discriminated against. Ortiz has not adduced any evidence related to the demography of the hiring pool at the times that AZ hired people who were under 40 years of age.

To rebut the argument that she was not performing up to level, Ortiz presents as evidence her evaluations while she was at AZ and information related to the bonuses that she received from AZ. As part of her supervisory role as a DSM, Gonzalez conducted field coaching days or "ride alongs" with her PSSs. The record shows that she conducted three "ride alongs" with Ortiz. The first occurred on November 2, 2005. The coaching form for that "ride along" repeatedly recognized Ortiz as having done a good job and noted the 30–second call she made with one doctor. Gonzalez also performed a "ride along" with Ortiz on January 19, 2006.[12] Once again Ortiz was recognized repeatedly for having done a good job and for doing a "very good" 30–second call in particular. A third "ride

---

**11.** Although Ortiz's statements to this effect are entirely conclusory, she supports her position with minimally sufficient details from other former employees of AZ. Nitza Lebron ("Lebron") stated under penalty of perjury that she filed two formal written complaints and contacted Kriegsmann because she felt that she was discriminated against as a pregnant woman. Lebron did not provide any details to explain how or in which way she faced discrimination, rather she simply said she had been harassed by Gonzalez and that no actions were taken in regard to her complaints. Both Wallace Ramirez ("Ramirez") and Mercedes Negron ("Negron") stated at depositions that they had complained to the Human Resources department when they worked for AZ and their complaints were not addressed. Ramirez provided no details concerning the nature of his complaint or the

steps he took. Negron said that over a period of several months she left three phone messages for Kriegsmann and sent him an email and yet she received no response. She described her complaint as "not feeling comfortable in [her] work environment." (Docket No. 83–3, p. 5.) She called Gonzalez "a person not to be trusted," and said she was "not a facilitator." (*Id.* at p. 6)

**12.** The coaching form itself states the date as November 19, 2005. (Docket No. 47–10) Ortiz testified, however, that the date on the form was an error and that it should have been January 19, 2006. (Docket No. 47–8, p. 24) AZ presents no evidence to contradict Ortiz's testimony on this point. Therefore the Court shall accept the January 19, 2006 date.

along" occurred on February 13, 2006. As before, the coaching form repeatedly lauded Ortiz for the good job she did, including recognizing the job she did delivering a managed care message which was an area highlighted for improvement in her prior coaching form.

In addition to the coaching forms, Ortiz was provided with a performance review for 2005. The review ranked Ortiz as having fully met the performance requirements. Apparently related to the 2005 annual review, Ortiz's annual base salary was increased by $500 for having fully met her performance requirements. Ortiz also received three incentive based awards (which are not individual awards) based upon the sale of AZ products in the territory or district in which she worked. She received $1,500 on November 30, 2005 for the sale of ATACAND SIP in August of that year. She received $4,500 on January 31, 2006 for the sale of ATACAND SIP in October of 2005. She received $1,500 on January 31, 2006 for the sale of Crestor in October 2005. Lastly, Ortiz received $7,352.00 for meeting her target incentives over the third trimester of 2005.

To lend support to her theory that she was mistreated because of her age, Ortiz submits evidence concerning actions taken by AZ in response to perceived inadequacies in Nitza Lebron's performance. Lebron had a low number of daily calls, absences from work, did not work the seven and one half hours on occasion, failed to submit some expense reports, failed to submit supporting documentation for expense reports and failed to submit administrative reports on time. Gonzalez provided Lebron with verbal warnings and a written follow-up documenting the verbal

warnings. Gonzalez also placed Lebron on an action plan.

Ortiz also presents evidence that numerous other PSSs made mass assignments and worked less than full days before and after the termination of Ortiz's employment with AZ. For example, Maritza Mendez ("Mendez"), Angel Colon ("Colon"), and Nora Vazquez ("Vazquez"), all employees supervised by Gonzalez, used mass assignments on 222, 249, and 24 days respectively between January 2005 and December 2006. During that same time period Mendez, Colon and Vazquez all had at least 30 days where they had 0–2 hours worked and 89 days with 2–4 hours worked.[13] Ortiz also adduced evidence that other PSSs who did not report to Gonzalez who repeatedly utilized mass assignments and worked less than seven and one half hour days.

## III. Discussion

### A. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex*

---

**13.** From January 2005 to December 2006 Vazquez had 45 days with 0–2 hours worked and 162 days with 2–4 hours worked. During that same time period Colon had 51 days with

0–2 hours worked and 98 days with 2–4 hours worked. Also during that same time period Mendez had 30 days with 0–2 hours worked and 89 days with 2–4 hours worked.

*Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J.*

*Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

**B. Age Discrimination in Employment Act ("ADEA")**

**1. Standard**

Pursuant to the ADEA an employer may not discharge or "otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] age." 29 U.S.C. § 623(a)(1). An employee claiming that her employment was terminated in violation of the ADEA "must shoulder the ultimate 'burden of proving that [her] years were the determinative factor in [her] discharge, that is, that [she] would not have been fired but for [her] age.'" *Torrech–Hernandez v. Gen. Elec. Co.,* 519 F.3d 41, 48 (1st Cir.2008) (quoting *Davila v. Corporacion De Puerto Rico Para La Difusion Publica,* 498 F.3d 9, 15 (1st Cir.2007) (quoting *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991) (additional citation omitted))). In the absence of direct evidence an employee may utilize a burden shifting framework to prove discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Velazquez–Fernandez v. NCE Foods, Inc.,* 476 F.3d 6, 11 (1st Cir.2007) (applying the *McDonnell Douglas* framework in an ADEA case).

The initial burden lies with the plaintiff to establish a *prima facie* case of discrimination. *Davila,* 498 F.3d at 15. To satisfy this burden, the plaintiff must adduce evidence in support of the following four facts: (1) that she was at least forty years of age; (2) that her job performance met the employer's legitimate expectations; (3) that the employer subjected her to an adverse employment action; and (4) that the employer had a continuing need for the services previously provided by the

plaintiff. *See, e.g., Torrech–Hernandez,* 519 F.3d at 48; *Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 68 n. 5 (2002); *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000).

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant-employer "to articulate a legitimate, nondiscriminatory basis for its adverse employment action." *Torrech–Hernandez,* 519 F.3d at 48. To be clear, this is not a burden of persuasion. *Davila,* 498 F.3d at 16. "[T]he employer need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." *Id.* Once the employer satisfies its burden of production, the presumption attending the *prima facie* case vanishes and the burden shifts back to the employee who must then show by a preponderance of the evidence that the reason given by the employer for the discharge is merely a pretext and that the real motivation for the adverse job action was age discrimination. *Velazquez–Fernandez,* 476 F.3d at 11; *Gonzalez,* 304 F.3d at 69. "In other words, the bottom-line question of discrimination *vel non* comes front and center. At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [she] was fired because of [her] age." *Davila,* 498 F.3d at 16 (citations omitted).

### 2. *Prima Facie* Case

Here, the first, third and fourth prongs of the *McDonnell Douglas* framework are not in dispute: AZ acknowledges that Ortiz was 40 years old when her employment was terminated; AZ acknowledges that it terminated Ortiz's employment; and AZ acknowledges that within seven months of Ortiz's termination her former position

was filled by Garcia. The parties allege that a dispute exists between them as to whether Ortiz satisfied the second prong of the framework. AZ states that Ortiz failed to meet its legitimate expectations for her which in turn lead to the termination of her employment. Ortiz responds by adducing evidence that she received positive reviews in coaching forms and a 2005 performance review as well as evidence that she was awarded several bonuses. Ortiz also adduces evidence in an attempt to show not only that she performed up to par, but also to show that AZ's rationale for her termination was a pretext for age based discrimination. Because the evidence relevant to the second prong of the framework is much the same as the evidence relevant to whether AZ's stated reasons for dismissing Ortiz were pretextual, and because additional evidence becomes relevant at that stage of the analysis, the Court shall assume without deciding that Ortiz proffered sufficient competent evidence to establish a *prima facie* case of age discrimination pursuant to the ADEA. *See Hillstrom v. Best Western TLC Hotel,* 354 F.3d 27, 31 (1st Cir. 2003) (assuming without deciding that the plaintiff made a *prima facie* showing in order to address pretext and the ultimate question of discrimination where employer asserted a legitimate nondiscriminatory reason for discharging the plaintiff); *Rivera–Aponte v. Restaurant Metropol # 3, Inc.,* 338 F.3d 9 (1st Cir.2003) (same); *Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 36 (1st Cir.2001) (same).

### 3. AZ's Burden of Production

The Court finds that AZ has easily met its "minimal" burden of production to articulate a legitimate, nondiscriminatory basis for its adverse employment action. *See Torrech–Hernandez,* 519 F.3d at 48. AZ explains, after all, that it terminated Ortiz's employment for the following rea-

sons: Ortiz omitted required information from her job application; she violated company policy and misrepresented expenses by ordering and listing lunch for ten when fewer than ten people attended lunch; she repeatedly worked fewer than the seven and one half hours that were expected of her; she incorrectly recorded her activities by utilizing mass assignments; and she reported sample signatures with so few minutes between signatures by doctors in different offices that Gonzalez believed she was not providing a full product discussion. AZ terminated Ortiz for all of these reasons but anyone of them standing alone suffices to meet AZ's burden of production. All of these explanations find support in the record and none of them involve a prohibited ageist bias.

### 4. Pretext and Discriminatory Animus

■ Thus, to withstand summary judgment Ortiz must show that AZ's purported rationale was mere pretext for an actual discriminatory rationale. Some of the ways by which Ortiz may do so are to show that AZ's stated rationale has no basis in fact or to show weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in AZ's proffered nondiscriminatory rationale. *Webber v. Int'l Paper Co.*, 417 F.3d 229, 237 (1st Cir.2005); *Santiago–Ramos*, 217 F.3d at 56 (citation omitted). Ortiz attempts to show pretext by adducing evidence and explanations to minimize the appearance of her alleged transgressions. She also relies upon the four allegedly ageist statements attributed to Gonzalez. Unfortunately for Ortiz, the statements that she relies upon are either stray remarks or ambiguous, while her attempt to provide context for her alleged shortcomings fails to undercut the factual underpinning for AZ's decision to termi-

nate her employment. Moreover, Ortiz fails to overcome the inference against ageist determination that arises when the people who hire an employee also fire that employee.

■ Ortiz argues that justifying her termination by focusing upon her failure to include her law degree in her résumé and job application should be considered a pretext because her failure to include the degree in her résumé was a simple oversight on her part and she omitted reference to the degree in the application because the application did not specifically request such information. Ortiz also states that Gonzalez found out about her law degree long before she was fired and that Gonzalez took no action at that time. While the Court sympathizes with Ortiz for her failure to include her law degree in her résumé, it does not sympathize with her because of her failure to include the degree in her application. The application specifically requests information about all universities attended and degrees received.[14] Moreover, Ortiz clearly did not understand this to exclude graduate level degrees; she included her masters degree in this section. Gonzalez's failure to take immediate punitive action against Ortiz once she learned of the law degree that Ortiz failed to mention in her application does not make her later reliance upon the omission pretextual. AZ explained that Ortiz's failure to include her law degree in her application was but the first of several acts that lead Gonzalez to question Ortiz's honesty.

The next such act was Ortiz's submission of an expense report for a "lunch and learn" with Doctor Rivera Del Rio and his staff claiming expenses for ten people. When Gonzalez reviewed this report and

---

14. The standards of employee conduct specifically reference falsifying an employment application as a ground for disciplinary action up to that of termination of employment.

realized that Doctor Rivera Del Rio did not have nine people in his office (including himself) it again led her to question Ortiz's honesty, which in turn lead to her consultation with Saavedra and Kriegsmann. Ortiz attempts to contextualize this transgression by explaining that she earlier ordered a lunch for ten people in Doctor Jordan's office when there were fewer than ten people in his office as well.[15] Ortiz's attempt to rationalize her mistake is lost upon the Court; two wrongs do not make a right. It was her job to find out how many people would attend the lunch from each doctor's office. Upon learning the correct number she could have chosen to order food from a restaurant that does not oblige customers to order for a minimum of ten people. Ortiz also asserts that the total value of the lunches in both instance were under $100.00 in an apparent attempt to minimize the appearance of her transgression. This clarification is beside the point, which is that Ortiz incorrectly submitted expenses for ten people when ten people could not have attended a lunch. Gonzalez understood this to be a dishonest act.

Once Gonzalez completed her six month review of Ortiz's performance she determined that Ortiz repeatedly had doctors sign for samples in 5–7 minute time intervals when those doctors did not share offices nor, in some instances, were those doctors on the same floor of the same building. Because the doctors are often hard to access quickly, Gonzalez believed that Ortiz did not provide the required product presentations before allowing the doctors to sign for samples. Aside from failing to comply with expectations for her

position, not providing a product discussion also implicates Ortiz's character for truth telling because obtaining a sample signature implies that she provided a product discussion. Ortiz suggests two reasons to view this rationale as pretext. First, she argues that AZ and Gonzalez condone 30–second product pitches, implying that 5–7 minutes between sample signatures was a sufficient amount of time for a PSS so long as the PSS only gave a 30–second pitch to the physicians. Second, she submits evidence that other PSSs obtained sample signatures in 5–7 minute intervals. The second argument, is of no avail to Ortiz; the fact that other people break a rule (or may be perceived to have broken a rule) does not make it acceptable for Ortiz also to break the rule. The situation might be different if Ortiz had shown that decision makers at AZ were aware that other PSSs were accepting sample signatures in 5–7 minute intervals and none of the other PSSs were disciplined or counseled such that there was a selective enforcement of the rule only against her or only against other people forty years of age or over and not against those younger than forty. She has not shown this.

Similarly, the fact that AZ allowed a 30–second product presentation, does not convert Gonzalez's suspicion concerning the 5–7 minute signature intervals into pretext. Common experience shows that upon arriving at a doctor's office it takes time to interact with the receptionist, it takes time for the doctor to become available (even if a meeting has been scheduled), and it takes time to walk to the next doctors office. While it is certainly conceivable

---

**15.** She ordered food for Doctor Jordan and his staff from a restaurant that only provides food for a minimum of ten people. In that instance she called ahead to Doctor Jordan's office and asked if she could order lunch for ten people. Someone in Dr. Jordan's office said yes, and so Ortiz went ahead and ordered the lunch. She then used the same restaurant for Dr. Rivera Del Rio's office without verifying how many people were in Dr. Rivera Del Rio's office.

that Ortiz scheduled meetings within close proximity to each other, that the doctors immediately became available for the meeting time, that Ortiz provided 30–second presentations, and that she moved quickly to the next meeting, this does not make Gonzalez's suspicion unreasonable or clearly pretextual.

Lastly, AZ found fault with Ortiz's apparent failure to work seven and one half hours on numerous occasions and with the mass assignments that Ortiz used on five occasions to describe the visits she made to physicians. Ortiz attempts to prove that Gonzalez's focus upon these issues was pretextual by showing that other PSSs worked fewer than seven and one half hours on numerous occasions and by showing that other PSSs used mass assignments many more times than she did. Specifically, Ortiz focuses on Lebron who while at AZ had a low number of daily calls, was absent from work on occasion, did not work the seven and one half hours, failed to submit some expense reports, failed to submit supporting documentation for expense reports and failed to submit administrative reports on time. Instead of firing Lebron for these shortcomings, Gonzalez issued her verbal warnings, a written follow-up documenting the verbal warnings, and placed her on an action plan. As AZ states, Lebron and Ortiz were not similarly situated; although they were both thought to have worked less than seven and one half hours, their documented transgressions of AZ's rules were not identical. If anything, the fact that AZ took some kind of disciplinary action in response to Lebron's shortcomings shows that AZ did in fact enforce violations of the work day rule and other rules against someone other than just Ortiz, someone younger than forty. Additionally, Gonzalez viewed Ortiz's violations of AZ policy as indicative of dishonesty, a view she stated in the disciplinary document effective March 17, 2006. There is no evidence, however, that Gonzalez viewed Lebron's violations as anything other than administrative in nature.

In sum, Ortiz does not proffer evidence to dispute whether she made the errors that AZ highlighted as nondiscriminatory rationales for Ortiz's termination. Instead, she presents evidence and arguments to explain why she made the mistakes or to minimize the gravity of the mistakes. In essence, she begs the Court to replace AZ's business judgment with its own by asking whether her transgressions were worthy of termination. The Court may not supplant AZ's decision with its own as long as it is satisfied that AZ had a nondiscriminatory rationale for its decision. *Velazquez–Fernandez,* 476 F.3d at 12; *Webber,* 417 F.3d at 238 (1st Cir.2005) ("an employer is free to terminate an employee for any nondiscriminatory reason, even if its business judgment seems objectively unwise."); *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 537 (1st Cir.1996) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality of employers' nondiscriminatory business decisions.") (quoting *Mesnick,* 950 F.2d at 825); *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.") (citation omitted). Accordingly, Ortiz's submissions concerning AZ's stated nondiscriminatory reasons do not expose those reasons as a pretext for age-based discrimination. This is not the only relevant evidence, however, as Ortiz relies upon ageist remarks and AZ points to the fact that Saavedra and Gonzalez were involved in both hiring and firing Ortiz.

### 5. Ageist Remarks

██ Ortiz asserts that four remarks made by Gonzalez between January and March of 2006 provide the necessary discriminatory animus to preempt summary judgment. AZ counters that these comments were mere "stray remarks" which do not provide the necessary inference of discriminatory animus.

 "Stray workplace remarks" normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus. *Gonzalez*, 304 F.3d at 69. In combination with other evidence, however, "so-called 'stray remarks' may permit a jury reasonably to determine that an employer was motivated by a discriminatory intent." *Straughn*, 250 F.3d at 36 (citations omitted). Although stray remarks may be material to a pretext inquiry, their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or were not related to the employment decision in question, or were made by non-decision makers. *Id.*; (citing *McMillan v. Mass. Soc'y. for Prev. of Cruelty to Animals,* 140 F.3d 288, 301 (1st Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999)). "[M]ere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." *Straughn,* 250 F.3d at 36.

None of the four allegedly ageist comments in this case, individually or collectively, or when considered in conjunction with the totality of the evidence adduced, exposes AZ's nondiscriminatory rationale as pretextual, nor do they constitute minimally sufficient evidence of prohibited age bias. The Court acknowledges, of course, that the remarks at issue were made by Gonzalez, Ortiz's supervisor and a decisionmaker in this case. The remarks were also not terribly far removed in time from the date that AZ terminated Ortiz's employment. Nonetheless, the comments can be grouped into two categories, both of which greatly circumscribe their relevance as evidence of prohibited discriminatory animus. The remarks made on January 3—that a certain health problem occurs as one grows older—and February 16—that Ortiz was too old to wear bikinis—are both completely unrelated to the termination of Ortiz's employment with AZ. The earlier comment was coupled with the suggestion that Ortiz visit a doctor, and it was not out of place in the context of the topic of the conversation. The second comment, was without a doubt inconsiderate, but it in no way suggests that Ortiz was deficient in any aspect of performing her job.

The second category of statements occurred when Gonzalez or Gonzalez and Saavedra met with Ortiz to discuss her performance on the job. Seen in retrospect, these meetings were preludes to the ultimate termination of Ortiz's employment because Ortiz was confronted with the errors she made which ultimately formed the basis for the nondiscriminatory rationale for her termination. "It is far from clear, [however] that the alleged remarks bespeak any age-based animus at all." *Gonzalez,* 304 F.3d at 70.

In both the February 27 statement—in which Gonzalez said to Ortiz that she was too old to make the mistakes that she made—and the March 13 statement—in which Gonzalez and Saavedra told Ortiz that she was old enough to know a lie—Ortiz's supervisors emphasized her age. They did so, however, in a way that implies that Ortiz was performing below the level they expected out of her and possibly that she offered an inadequate explanation for including incorrect or incomplete infor-

mation in documents she authored. Rather than implying a problem that came with age the comments reflected a belief that certain positive attributes come with age. The Court does not discard all possible interpretation of these remarks as bespeaking an illegal animus, considering for example, that these comments are stock phrases for adults interacting with teenagers but not for interactions with someone who has already passed through her teenage years. Thus, the Court views these comments as ambiguous, although more suggestive of a nondiscriminatory animus rather than a discriminatory one. As such, they (alone) do not constitute evidence which is sufficient to prove discriminatory intent. *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir.1997) ("isolated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent."); *Lehman v. Prudential Ins. Co. Of America*, 74 F.3d 323, 329 (1st Cir.1996) (similar); *cf. Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572 (1st Cir.1999) ("a statement that plausibly can be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus"), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

### 6. Same Actor (Hire and Fire)

██ AZ argues that the Court should draw an inference in its favor because the "same actor" was involved in both hiring and firing Ortiz. Ortiz disputes whether the same actors were involved and also argues that any inference that could be drawn in AZ's favor is overcome by the evidence she adduces showing unlawful prejudice. As a threshold matter, the Court rejects Ortiz's contention that the same actors were not involved in hiring and firing Ortiz. It is true that two other DSMs were involved in the decision-making process to hire Ortiz and it is also true that Kriegsmann signed off on the decision to fire Ortiz, but none of these facts diminish the importance of Gonzalez and Saavedra in the hiring and firing processes. Ortiz was interviewed for a vacancy in Gonzalez's district team. Saavedra interviewed her alone during the second stage interview. The decision to hire Ortiz was made by the group that interviewed her (three DSMs including Gonzalez, and Saavedra). The Court finds unrealistic the suggestion that the other two DSMs for whom Ortiz would not work somehow exerted their influence to cause AZ to hire Ortiz over the objections of Gonzalez and Saavedra who were presumably disinclined to hire her because of the discriminatory animus they bore towards people of a certain age. Similarly the fact that Gonzalez and Saavedra consulted with Kriegsmann, a senior Human Resources employee who reviewed the materials they provided related to Ortiz's performance, does not convert Gonzalez and Saavedra into non-actors in Ortiz's dismissal. Gonzalez and Saavedra saw what they perceived to be deficiencies in Ortiz's performance, they both met with her to discuss those shortcomings and then they both recommended her termination to Kriegsmann. Kriegsmann agreed. Accordingly, the Court finds that both Gonzalez and Saavedra were principal actors involved in hiring and firing Ortiz.

Given the Court's conclusion, and the short period of time—seven months—that Ortiz was employed at AZ, it becomes necessary to define the nature of the inference that may be drawn in favor of the defendant. As the Fourth Circuit Court of Appeals has explained, "claims that employer animus exists in termination but not in hiring seem irrational." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991). "It hard-

ly makes sense [for a putative discriminator] to hire workers from a group that one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Id.* (quoting Donohue & Siegelman, *The Changing Nature of Employment Discrimination Litigation,* 43 Stan. L. Rev. 983, 1017 (1991)).

■ There is debate among the circuit courts of appeal about the strength of the inference that may be drawn from the same actor circumstance. The First Circuit Court of Appeals has implicitly recognized the existence of the inference, but it has not weighed in on the issue of the strength of the inference. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 847 (1st Cir.1993); *see also McMillan,* 140 F.3d at 303 n. 10. There is a strong version of the inference advocated by the Fourth Circuit Court of Appeals in which the fact that the hirer and firer is the same actor appears to overwhelm any other inference which may be drawn from other evidence. *Proud,* 945 F.2d at 798 ("there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes."). There is also a weak version that treats the same actor circumstance as a piece of evidence like any other, not entitled to any presumptive value. *See Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 573–74 (6th Cir.2003); *Haun v. Ideal Indus., Inc.,* 81 F.3d 541, 546 (5th Cir.1996) ("we decline to establish a rule that no inference of discrimination could arise under such circumstances."); *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 496 n. 6 (3rd Cir.1995). This court agrees with the "weak version" to the extent that it believes that no presumption applies because the same actors hired and fired the plaintiff. It also understands that the same actor fact must be considered in conjunction with all of the other evidence presented at summary judgment. Nonetheless, where evidence is not submitted to undercut the same actor circumstance, it is an important fact for the defendant.

■ Here the evidence of pretext is weak. Ortiz does not present evidence to contradict AZ's assertion that she engaged in the conduct that AZ found problematic (*i.e.,* omitting information from her application, submitting an expense report for more people than attended a lunch, working less than a full day, having 5–7 minute intervals between sample signatures in some instances). She also does not present evidence to make the Court question whether Gonzalez and Saavedra truly concluded that Ortiz acted dishonestly. The ageist remarks that Gonzalez allegedly uttered were either unrelated to Ortiz's job or ambiguous. At best, Ortiz's evidence of pretext suggests that AZ may have overreacted to a series of what Ortiz believed to be minor or common errors. Given this universe of facts, the additional fact that Gonzalez and Saavedra hired and fired Ortiz within a seven month period takes on heightened importance and it necessitates this Court's dismissal of Ortiz's ADEA claim. *See Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996) (crediting the same actor inference while stating that plaintiff "produced no meaningful evidence indicating either that [the employer's] proffered explanation was false or that her supervisor harbored discriminatory animus towards her because she was a woman"); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174 (8th Cir.1992) (upholding a directed verdict in favor of defendant where plaintiff's evidence of pretext was "thin, but perhaps sufficient, all other things being equal" if not for the same actor inference).

### C. State Claims

Because no federal claim remains to ground jurisdiction in this case, plaintiffs' state law claims against defendants are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** AZ's motions to strike and **GRANTS** AZ's motion for summary judgment. Ortiz's ADEA claim against AZ is dismissed with prejudice, leaving no remaining federal claim. The supplemental state law claims (*i.e.,* Law 44, Law 80, and Law 100) are dismissed without prejudice. Judgment shall enter accordingly.

**IT IS SO ORDERED.**